2024-1198

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ALBERT NELSON LOBO,
Petitioner,

v.

DEPARTMENT OF JUSTICE,
Respondent.

Petition for Review of the Bureau of Justice Assistance
Decision in Case No. 2015-DIS-039

# CORRECTED BRIEF FOR RESPONDENT

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ALBERT S. IAROSSI
Assistant Director

ANNE M. DELMARE
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-0531
E-mail: Anne.M.Delmare@usdoj.gov

June 3, 2024

*Attorneys for the Respondent*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF THE ISSUE ........ 2

STATEMENT OF THE CASE ........ 2

I. The PSOB Act And Implementing Regulations ........ 2

II. Statement Of Facts And Course of Proceedings Below ........ 4

SUMMARY OF THE ARGUMENT ........ 10

ARGUMENT ........ 11

I. Standard Of Review And Scope Of Jurisdiction ........ 11

II. The Director's Decision Should Be Affirmed ........ 12

A. The Director's Decision Substantially Complied With The PSOB Statute And Regulations When Declining To Adopt Statements Provided By Sheriff McMahon ........ 13

B. Medical Evidence Submitted Did Not Satisfy PSOB Act Requirements For Disability Benefits ........ 21

C. Opinions Provided By Dr. Oetgen And Dr. Diaz Further Demonstrate That The BJA Director's Decision Was Substantially Justified ........ 24

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Amber-Messick v. United States*,
483 F.3d 1316 (Fed. Cir. 2007) .......... 11, 22

*Afolayan v. DOJ,*
2022 U.S. App. LEXIS 10208 (Fed. Cir. 2022) .......... 3

*Brister v. United States*,
No. 01-180C, slip op. at 5–6 (Fed. Cl., Mar. 27, 2002) .......... 23

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .......... 10, 11, 12

*Demutiis v. United States*,
291 F.3d 1373 (Fed. Cir. 2002) .......... 19

*Flethez v. San Bernardino County Retirement Association*,
2 Cal. 5th 630 (Cal. 2017) .......... 18

*Li v. Dep't of Justice*,
947 F.3d 804 (Fed. Cir. 2020) .......... 11

*Malin v. DOJ*,
623 Fed. Appx. 995 (Fed. Cir. 2015) .......... 19, 20

*Moore v. Dep't of Justice*,
760 F.3d 1369 (Fed. Cir. 2014) .......... 23

*Ortiz-Lebrón v. United States*,
65 F. Supp.3d 305 (D. P.R. 2014) .......... 2

*Rose v. Ark. State Police*,
479 U.S. 1 (1986) .......... 2

*Sledge v. DOJ*,
786 Fed. Appx. 1006 (Fed. Cir. 2019) .......... 20

*Yanco v. United States*,
258 F.3d 1356 (Fed. Cir. 2001) .......... 17-18

**STATUTES**

18 U.S.C. 1001 .......... 15

28 U.S.C. 1746 .......... 15
34 U.S.C § 10281 .......... 2, 3, 7, 10, 12, 19
34 U.S.C. § 10285 .......... *Passim*
Cal. Lab. Code. Ann. § 3212 (West, 2022) .......... 19, 21, 22
Cal. Govt. Code. Ann. § 31720 .......... 18

**REGULATIONS**

28 C.F.R. § 32 .......... *Passim*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, respondent's counsel states that she is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Respondent's counsel also states that she is unaware of any case pending in this or any other court that may directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUE

The Bureau of Justice Assistance (BJA or Bureau), a component of the Office of Justice Programs, within the Department of Justice, determined that the petitioner, Albert Lobo, was not entitled to disability benefits under the Public Safety Officers' Benefits (PSOB) Act. The issue here is whether the Bureau's determination should be affirmed because Mr. Lobo has not demonstrated that the determination was: (1) arbitrary or capricious; (2) unsupported by substantial evidence; or (3) noncompliant with the law.

## STATEMENT OF THE CASE

Mr. Lobo appeals a decision of the Director of the Bureau, denying his claim for benefits pursuant to 34 U.S.C. § 10281(b).

### I. The PSOB Act And Implementing Regulations

The PSOB Act authorizes the payment of a legal gratuity,[1] "[i]n accordance with regulations issued pursuant to [the PSOB Act], in any case in which the Bureau determines that a public safety officer has become permanently and totally disabled as the direct and proximate result of a personal injury sustained in the line

[1] *See, e.g., Rose v. Ark. State Police*, 479 U.S. 1, 4 (1986) ("Congress intended that the [amount paid under the PSOB Act] would be a 'gratuity[]'") (internal citation omitted); *Ortiz-Lebrón v. United States*, 65 F. Supp.3d 305, 307 (D. P.R. 2014) ("Benefits under the PSOB Act are considered legal gratuities as opposed to a statutory right."); 28 C.F.R. § 32.0(b) (the PSOB Act "authorizes the payment of three different legal gratuities").

of duty." 34 U.S.C. § 10281(b). The Bureau administers the Act, which, in conjunction with the Act's implementing regulations, 28 C.F.R. part 32, sets forth the conditions under which a claimant may be entitled to the gratuity. Pursuant to 34 U.S.C. § 10285(b)(1), "[r]esponsibility for making final determinations shall rest with the Bureau."

The Judiciary Committee of the House of Representatives recognized that, although the PSOB Act is an "important resource" for public safety officers and their families, it is not "an insurance program, a workers' compensation program, or a remedial program and never has been." H.R. Rep. No. 112-548, at 6 (2012); *Afolayan v. DOJ*, 2022 U.S. App. LEXIS 10208, *13 (Fed. Cir. 2022). Further, claims should be decided "strictly in accordance with the PSOBA and the underlying law governing legal gratuities . . . based on real, objective, and legally sufficient evidence that objectively meets the standards of proof set forth in the law, rather than speculation, fancied legislative intent, uncorroborated assertions, biased evidence, a slanted record, incomplete information, or sympathy, however, understandable or deeply felt." H.R. Rep. No. 112-548, at 8. "[A]ll PSOBA claimants have the burden of proof as to every element of their claims, and any claim that lacks legally-sufficient objective evidence as to a material element, as a matter of law, must be denied." *Id*. at 11.

## II. Statement Of Facts And Course Of Proceedings Below

Mr. Lobo began working for the San Bernardino County Sheriff's Office on January 18, 1997. Appx4, Appx50.[2] In November 2009, he was promoted to Deputy Sherriff and subsequently assigned to the Victor Valley Jail. Appx4, Appx50, Appx234. In January 2010, Mr. Lobo developed flu-like symptoms, including a cough and runny nose, which he treated with over-the-counter medications. Appx4, Appx372. Records show that in March 2010, Mr. Lobo sought outpatient treatment for an earache and sore throat that were treated with antibiotics. Appx392. On April 24, 2010, Mr. Lobo presented to the emergency department at San Antonio Community Hospital suffering from a non-productive cough of five months duration and fever of two days duration. Appx393. Mr. Lobo was diagnosed with conditions including diabetic ketoacidosis, community-acquired pneumonia, and acute kidney failure. Appx394; Appx622; Appx629. Mr. Lobo was also found to have sepsis, and as his condition worsened during the course of his hospitalization, he sustained interstitial lung disease, myocardial infarction, and amputations of portions of four limbs due to disseminated intravascular coagulation. Appx4, Appx304, Appx619.

[2] "Appx__" refers to the joint appendix that Mr. Lobo will file after he files his reply brief. *See* Fed. Cir. R. 30(a)(2).

Dr. Mark Hyman, a board-certified internal medicine physician, performed an “Agreed Medical Examination” of Mr. Lobo for workers’ compensation purposes on May 2, 2011, and an “Agreed Medical Examination Re-Evaluation” on November 14, 2012. Appx302, Appx371. Dr. Hyman reviewed 9,344 pages of medical records for purposes of Mr. Lobo’s workers’ compensation claim, and Dr. Hyman was deposed in July 2011 in connection with that claim. Appx102, Appx390. Following a physical examination, review of the record, and listing diagnoses including diabetes, pneumonia with complications including interstitial disease, myocardial infarction with history of atrial fibrillation, left below-the-knee amputation, right below-the-knee amputation, left transhumeral amputation, and right-hand digits amputation, Dr. Hyman opined that Mr. Lobo “must now be considered 100% disabled. He has no reasonable future earnings capacity ... and has no reasonable ability to compete in an open labor market.” Appx378. This finding is uncontested.

Dr. Hyman further opined that Mr. Lobo developed pneumonia, which progressed to a more severe form of pneumonia leading to sepsis, meaning “the infection goes into the bloodstream.” Appx377. As to the source of Mr. Lobo’s pneumonia, Dr. Hyman wrote that the illness was,

> acquired through direct contact with infected individuals. [Mr. Lobo] was working throughout and up until the time of his severe illness. He had contact with inmates and the inmate population is well known to harbor multiple

> bacteria. He is not aware of direct contact with anybody in the home environment who had similar difficulties or illnesses. *Further, upper respiratory infections and pneumonia in a peace officer are presumed to be industrially related*. Therefore, his pneumonia would be industrially related. Therefore, all of his complications would be industrially related.

Appx377-78 (emphasis added); Appx30. In a July 2011 deposition, Dr. Hyman was asked to clarify how he reached the conclusion of the cause of Mr. Lobo's pneumonia. Appx106. Dr. Hyman testified that he did not identify the type of pneumonia, but testified that, based on the records he reviewed, the cause of the pneumonia was Mr. Lobo's "occupational duties." Appx107. He further testified that "the likelihood [of the Claimant acquiring pneumonia] is far greater from the work environment than the two urgent care visits." Appx129. In support of his conclusion, he noted that "[w]e have a lot of medical literature that identifies inmate and prison populations as having high degrees of infectious agents, and they can easily transmit those infectious agents." Appx130. Dr. Hyman's final agreed medical examination, performed in November 2012, indicated that there were no significant changes in his opinion, but he noted that new records from November 2010 "isolated a pneumococcus as the bacteria which caused [Mr. Lobo's] severe difficulties." Appx304-305.

In April 2013, the San Bernardino County Employees' Association granted Mr. Lobo a service-connected disability retirement, effective January 12, 2013.

Appx4, Appx73, Appx84. Mr. Lobo and the County of San Bernardino entered into Stipulations with Request for Award, and an Award of workers' compensation benefits was issued on November 28, 2012, and became final in August 2014. Appx4-5, Appx83, Appx89.

On March 9, 2015, Mr. Lobo filed a claim with the PSOB Office, seeking disability benefits under 34 U.S.C. § 10281. Appx2, Appx44-45. The documentation submitted to support the claim was forwarded to Dr. William Oetgen, a medical examiner engaged by the Bureau pursuant to 34 U.S.C. § 10225, for an independent evaluation. Appx137-140, Appx163. In a written opinion, Dr. Oetgen stated that "there is medical certainty that Mr. Lobo's pneumonia directly caused his subsequent medical complications and led to his amputations," and "there is also medical certainty that Mr. Lobo is now totally and permanently disabled." Appx142. Regarding causation, however, Dr. Oetgen explained that "the file is devoid of evidence that Mr. Lobo's illness was work related or that he contracted pneumonia from an infected inmate." *Id.* And, though it is true that people who work in crowded places, such as prisons, have a higher risk of contracting community acquired pneumonia, those with diabetes are more susceptible to infections such as pneumonia. *Id.* Dr. Oetgen noted that Mr. Lobo's "medical history is significant for a diagnosis of diabetes in 1997," and concluded that "[t]here is no medical certainty in this case that the performance of

[Mr. Lobo's] law enforcement duties was a substantial factor in his development of pneumonia." Appx141-42.

In a determination dated May 5, 2016, the PSOB Office denied the claim for disability benefits on the basis that the evidence did not show that Mr. Lobo's medical condition was the direct and proximate result of an injury sustained in the line of duty. Appx165. Mr. Lobo filed a request for a determination of his claim by an independent Hearing Officer, and the appeal was assigned to Hearing Officer Shinina Butler. Appx212-216. After a *de novo* review of the record, which included Mr. Lobo's in-person testimony and additional evidence, the Hearing Officer determined that Mr. Lobo had sustained a personal injury, but she was not persuaded that such injury was sustained in the line of duty. Appx584. The Hearing Officer concluded that "[Mr. Lobo] ha[d] not established by a standard of more likely than not that he contracted pneumonia in the line of duty," and she denied the claim. *Id.* On January 2, 2018, Mr. Lobo filed an appeal to the Director of the BJA. Appx597.

The Director acknowledged that the weight of the evidence established that Mr. Lobo was permanently and totally disabled, as those terms are defined in the implementing regulations. Appx11. Accordingly, the remaining issue before the Director was whether it is more likely than not that Mr. Lobo's pneumonia satisfied the statutory requirement that it be "the direct and proximate result of a

personal injury sustained in the line of duty." *Id.* The BJA sought an expert opinion from Dr. James Diaz, a medical examiner engaged by the Bureau pursuant to 34 U.S.C. § 10225, as to whether Mr. Lobo's pneumonia and its complications were "the direct and proximate result" of an exposure to a pathogen in the course of his duties as a correctional officer. Appx610-16. Dr. Diaz could not identify the source of the pathogen that caused Mr. Lobo's pneumonia, finding it equally likely that he was exposed at the jail or in other settings. Appx623-24.

In a 16-page decision, the BJA Director determined that based upon (1) the lack of evidence in the record as to any pneumonia-infected inmate in the jail where Mr. Lobo worked, (2) Dr. Oetgen's statement that the file is devoid of evidence that Mr. Lobo's illness was work related or that he contracted pneumonia from an infected inmate, and (3) Dr. Diaz's inability to identify a particular source of the pneumonia, and, given Mr. Lobo's history of diabetes, the BJA Director was "not persuaded that it is more likely than not that [Mr. Lobo] contracted his disabling pneumonia in the course of performing line of duty activities as a Deputy Sheriff." Appx1-27, Appx17. Accordingly, on August 18, 2023, the Director denied Mr. Lobo's Appeal. Appx26-27.

This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the Bureau's final agency determination that the record evidence does not support that Mr. Lobo sustained an injury "in the line of duty" within the meaning of the PSOB Act and its implementing regulations. Appx26.

Mr. Lobo argues that Dr. Hyman's opinion regarding causation should be credited, despite the foundation of the opinion having no basis in evidence demonstrating that Mr. Lobo was actually exposed to pneumonia in the workplace. Instead, Dr. Hyman speculates that because Mr. Lobo was working in the jail during the time period that he contracted pneumonia, he did not report illness at home, and academic literature references illness in the jail system, these factors indicate that his illness originated from his workplace. Appx378. Dr. Hyman further concluded, consistent with California state law, that "upper respiratory infections and pneumonia in a peace officer are presumed to be industrially related[,] [t]herefore, [his pneumonia] would be industrially related." Appx378. Dr. Hyman's analysis is not based upon, and fails to meet the legal standard employed by 34 U.S.C. § 10281(b), which requires proof that the disability was the "direct and proximate result of a personal injury sustained in the line of duty."

Conversely, Mr. Lobo contends that both the opinions of Dr. Oetgen and Dr. Diaz should be disregarded because, *inter alia*, the doctors did not personally

evaluate Mr. Lobo. Dr. Oetgen concluded that the file is devoid of evidence that Mr. Lobo's illness was related to his work or that he contracted pneumonia from an infected inmate. Dr. Diaz concluded that he is unable to identify the source of the pathogen that caused Mr. Lobo's pneumonia, and found it equally likely that he was exposed at the jail or in other settings. But Mr. Lobo is unable to point to any evidence demonstrating that he was exposed to pneumonia in his workplace or that a personal evaluation of him would have disclosed the source of his illness.

Mr. Lobo cannot demonstrate that the BJA Director's determination, which aligns with the text of the PSOB Act and its implementing regulations, was arbitrary or capricious, unsupported by substantial evidence, or legally erroneous.

## ARGUMENT

### I. Standard Of Review And Scope Of Jurisdiction

The Court's review of the Bureau's determinations under the PSOB Act is limited to ascertaining whether such determination is (1) arbitrary and capricious; (2) unsupported by substantial evidence; or (3) substantially non-compliant with the statutory requirements and provisions of the implementing regulations. *Li v. Dep't of Justice*, 947 F.3d 804, 807 (Fed. Cir. 2020); *Amber-Messick v. United States*, 483 F.3d 1316, 1321 (Fed. Cir. 2007).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*,

383 U.S. 607, 620 (1966). Here, the Court reviews the BJA Director's final decision to determine whether substantial evidence supports its finding that Mr. Lobo did not establish that he was exposed to pneumonia in the line of duty.

## II. The Director's Decision Should Be Affirmed

Mr. Lobo argues that the BJA Director arbitrarily, capriciously, and wrongfully denied PSOB benefits to Mr. Lobo because the Director found that he sustained an "injury" within the meaning of the PSOB Act and implementing regulations but failed to award payment. App. Br. at 11. Pursuant to 34 U.S.C. § 10281(b), "in any case in which the Bureau determines that a public safety officer has become permanently and totally disabled as the direct and proximate result of a personal injury sustained in the line of duty," the Bureau is to pay the legal gratuity specified under the Act. Thus, while a finding of an "injury" is necessary to a finding of eligibility for PSOB Act benefits, it alone is not sufficient. The issue here is not whether Mr. Lobo sustained an injury, but whether that "injury" was "sustained in the line of duty." Appx11.

There is no evidence that anyone in the jail where Mr. Lobo worked had pneumonia during the relevant time period (or during any time period for that matter), and there is no evidence that Mr. Lobo had contact with any infected individuals such that he could have been exposed to pneumonia in the course of his work. *See generally* Appx2-17. Mr. Lobo fails to grapple with the lack of

evidence of causation and argues that the BJA is obligated to adopt the presumption in California law that Mr. Lobo's pneumonia was presumptively caused by line of duty activity. For the reasons discussed below, this argument is meritless.

### A. The Director's Decision Substantially Complied With The PSOB Statute And Regulations When Declining To Adopt Statements Provided By Sheriff McMahon

The provisions of 34 U.S.C. §§ l0285(b)(2) and (b)(3) direct the Bureau to "give substantial weight to the evidence and all findings of fact presented by a State, local, or Federal administrative or investigative agency regarding eligibility for death or disability benefits" and, "[i]f the head of a State, local, or Federal administrative or investigative agency, in consultation with the principal legal officer of the agency, provides a certification of facts regarding eligibility for death or disability benefits, [to] adopt the factual findings, if . . . supported by substantial evidence." 34 U.S.C. §§ 10285(b)(2), (b)(3). Mr. Lobo contends that, in light of these statutory provisions, the purported "certification of facts" by Sheriff McMahon from the San Bernardino County Sheriff-Coroner Department, which included Mr. Lobo's workers' compensation and disability retirement benefits, compels an award of PSOB program disability benefits. App. Br. at 11-12.

Mr. Lobo also argues that the BJA Director's denial of benefits is contrary to the statutory intent of 34 U.S.C. §§ 10285(b)(2) and (b)(3), and that the Bureau

was obligated to give substantial weight to the evidence presented and adopt the factual findings presented. App. Br. at 11-12. Mr. Lobo acknowledges that the first step in statutory interpretation is to determine whether the language has a plain and unambiguous meaning. *Id.* at 12. He argues that the PSOB regulation at 28 C.F.R. § 32.5(b), which provides (emphasis added) that, "*except as otherwise may be expressly provided in the Act or this part*, the PSOB determining official may, at his discretion, consider (but shall not be bound by) the factual findings of a public agency (or public safety agency)," conflicts with the statute. App. Br. at 13. By its express terms, however, 28 C.F.R. § 32.5(b) applies only to the extent that it does not conflict with the PSOB Act. Accordingly, Mr. Lobo's quarrel is not with the regulation itself, but rather with the application of this regulation.

As the Director accurately pointed out in his decision, Mr. Lobo's reliance on sections 10285(b)(2) & (b)(3) is misplaced. Section 10285(b)(2) requires the Bureau to give substantial weight only to "evidence and findings of fact presented by a State, local, or Federal administrative or investigative agency regarding eligibility for death or disability benefits." Section 10285(b)(3) requires the BJA to adopt factual findings only in instances where the head of a State, local, or Federal administrative or investigative agency, in consultation with the principal legal officer of the agency, provides a certification of facts regarding eligibility for death or disability benefits if the factual findings are supported by substantial

evidence. Sections 10285(b)(2) and (b)(3) are specific to death and disability benefit determinations from agencies charged with either investigating the cause and nature of the injury or adjudicating eligibility for death or disability benefits. And 34 U.S.C. § 10285(b)(1) commands that "responsibility for making final determinations shall rest with the Bureau." Accordingly, as indicated on the face of the statute, the "administrative or investigative agency" referenced in section 10285(b)(2) and (b)(3) is a specific kind of "public agency"—one with "administrative or investigative" authority to gather "evidence and [make] findings of fact . . . regarding eligibility for death and disability benefits"—and is not necessarily the same agency as the public safety officer's employing agency.

Moreover, the BJA is required to adopt factual findings pursuant to section 10285(b)(3) only if the following conditions are met: (1) there must be a "certification" of facts that is made by the head of an agency charged with investigating the nature or cause of injury or determining eligibility for death or disability benefits; (2) the certification of facts must be made in consultation with the principal legal officer of the agency; (3) the certification of facts must regard eligibility for death or disability benefits; (4) the certification must be "[i]n accordance with regulations issued pursuant to [the PSOB Act]"—*i.e.*, must constitute a "certification" within the meaning of those regulations;[3] and (5) the

[3] 28 C.F.R. § 32.3 (defining *Certification*):

BJA must determine that the factual findings contained in the agency's certification are supported by substantial evidence. Although statements from witnesses or public safety agency employees well may be "evidence" of a kind and presumptively admissible in support of PSOB claims, such statements are not necessarily "evidence [or] findings of fact" within the meaning of 34 U.S.C. § 10285(b), when such statements are interpretations or conclusions about such events and not an authoritative report of the evidence officially gathered or officially discovered pursuant to an investigation.

---

> *Certification* means a formal assertion of a fact (or facts), in a writing that is—
>
> (1) Expressly intended to be relied upon by the PSOB determining official in connection with the determination of a claim specifically identified therein;
>
> (2) Expressly directed to the PSOB determining official;
>
> (3) Legally subject to the provisions of 18 U.S.C. 1001 (false statements) and 1621 (perjury), and 28 U.S.C. 1746 (declarations under penalty of perjury), and expressly declares the same to be so;
>
> (4) Executed by a natural person with knowledge of the fact (or facts) asserted and with legal authority to execute the writing (such as to make the assertion legally that of the certifying party), and expressly declares the same (as to knowledge and authority) to be so;
>
> (5) In such form as the Director may prescribe from time to time;
>
> (6) True, complete, and accurate (or, at a minimum, not known or believed by the PSOB determining official to contain any material falsehood, incompleteness, or inaccuracy); and
>
> (7) Unambiguous, precise, and unequivocal, in the judgment of the PSOB determining official, as to any fact asserted, any matter otherwise certified, acknowledged, indicated, or declared, and any provision of this definition.

Accordingly, Sheriff McMahon's purported "certification of facts" do not constitute factual findings that the BJA must adopt. In the first place, they were not "certifications" at all, within the meaning of the PSOB implementing regulations. Second, Sherriff McMahon's purported certifications were not made by the head of an agency charged with investigating the nature or cause of injury or determining eligibility for death or disability benefits; nor is there evidence that they were made in consultation with the principal legal officer of the agency. Contrary to Mr. Lobo's assertion that the "BJA rejected all four Certifications of Fact by Sherriff McMahon," App. Br. at 14, the BJA Director considered the reports as evidence in support of the PSOB claim, Appx18, but was not required to adopt the statements as certifications, or otherwise as factual findings under 34 U.S.C. § 10285(b)(3).

Conversely, as required by statute, the BJA Director adopted factual findings that were within the ambit of 34 U.S.C. § 10285. In an August 2014 decision, the California Workers' Compensation Appeals Board, which is a "state administrative or investigative agency" within the meaning of sections 10285(b)(2) and (b)(3), made several "findings of fact" relevant to this matter. Appx13. These findings included that Mr. Lobo: (1) sustained injury while employed as a Deputy Sheriff; (2) developed pneumonia in January 2010; (3) was hospitalized on April 24, 2010; (4) went into septic shock, suffered multiple cardiac arrests, organ failure, and

became comatose; and (5) subsequently developed intravascular coagulation resulting in amputations of portions of all four extremities. Appx13; Appx89-92.

The San Bernardino County Employees' Retirement Association (SBCERA) determination of eligibility for disability retirement concluded that Mr. Lobo's "disability is Service-Connected based on multiple amputations caused by complications of pneumonia with sepsis and disseminated intravascular coagulation." Appx570. This April 2013 decision, however, necessarily rests on the State's legal standard governing eligibility for these benefits found in the County Employee's Retirement Law of 1937 and related laws. Cal. Gov. Code §§ 31720, *et seq.*; *see, e.g., Flethez v. San Bernardino County Retirement Association*, 2 Cal. 5th 630, 635 (Cal. 2017) (the Supreme Court of California explaining county retirement systems provide disability retirements based on an employee becoming permanently incapacitated for the performance of his or her work duties). The SBCERA's causation determination is based on a different legal framework from that of the PSOB Act and implementing regulations. Although Cal. Govt. Code. Ann. § 31720 requires that the officer's disability be the "result of injury or disease arising out of and in the course of the [officer's] employment," and "contribute[] substantially to" disability, the SBCERA determination also is based on the legal presumption under California law that a disability resulting from

pneumonia arose out of, or in the course of employment. Cal. Lab. Code. Ann. § 3212 (West, 2022).

The PSOB Act, in sharp contrast, requires a showing that an injury was "sustained in the line of duty," and, "[i]n accordance with regulations issued pursuant to [the PSOB Act,]" that showing must be made by "the standard of proof of 'more likely than not.'" 34 U.S.C § 10281(b); 28 C.F.R. § 32.5; Appx577-78. A legal requirement that the Bureau, in PSOB determinations, give substantial weight to the evidence and findings of fact presented by administrative and investigative agencies does not apply "to their legal conclusions[,] [a]lthough the Bureau could give [a local agency's] legal conclusion whatever weight, if any, it deemed appropriate, it [i]s not required to give it any weight." *Demutiis* v. *United States*, 291 F.3d 1373, 1379-80 (Fed. Cir. 2002); *Yanco* v. *United States*, 258 F.3d 1356, 1360-63 (Fed. Cir. 2001) (upholding agency PSOB determination despite contrary state pension benefits rulings by state and local agencies); *Malin v. DOJ*, 623 Fed. Appx. 995, 999 (Fed. Cir. 2015) (workers' compensation award predicated on an occupational disease is not an "injury" under the PSOB Act; successful claims for workers' compensation and disability retirement benefits do not establish error in the Bureau's decision).

In this case, there would need to be evidence that the bacteria that caused Mr. Lobo's pneumonia was contracted during an activity or action that was

performed in the line of duty. *See Malin*, 623 Fed. Appx. at 999 (substantial evidence supported Bureau determination that officer's condition was not the direct and proximate result of his work where there was no evidence of officer's workplace exposure to toxins). Additionally, a determination as to proximate causation is a legal conclusion rather than a "finding of fact," and that determination is statutorily entrusted to the BJA. *See* 34 U.S.C. § 10285(a)(1) ("In making determinations under section 10281 of this title, the Bureau may utilize such administrative and investigative assistance as may be available from State and local agencies. *Responsibility for making final determinations shall rest with the Bureau*.") (emphasis added); *Sledge v. DOJ*, 786 Fed. Appx. 1006, 1012 (Fed. Cir. 2019) (the determination of whether the facts establish an official as a "law enforcement officer" under the PSOBA is a conclusion of law based on Federal law, not state law); *Amber-Messick v. United States*, 483 F.3d 1316, 1325 (Fed. Cir. 2007) ("[W]e find unpersuasive [Petitioner]'s contention that the fact she received benefits under the Pennsylvania Emergency Law Enforcement Personnel Death Benefits Act supports her claim under PSOBA.").

Finally, even if Sheriff McMahon's statements were considered "Certification of Facts" (which they are not), his legal conclusion regarding causation is not supported by substantial evidence, and therefore is not entitled to be accorded the weight that Mr. Lobo contends or adopted by BJA in accordance

with 10285(b)(2) or (b)(3). Thus, Mr. Lobo has failed to establish an error in the agency's decision. The Director applied the correct law when concluding that it was not required to adopt factual findings submitted by Sheriff McMahon.

### B. Medical Evidence Submitted Did Not Satisfy PSOB Act Requirements For Disability Benefits

Mr. Lobo contends that he is entitled to PSOB Act benefits based on Dr. Hyman's opinion that his pneumonia was contracted due to his work in the correctional facility. App. Br. at 17-18. Mr. Lobo's reliance on Dr. Hyman's opinions as to causation is misplaced as these opinions were rendered in the context of California workers' compensation law, which presumes that pneumonia developing while an individual is serving as a member of a sheriff's department was caused by the officer's employment. *See, e.g.,* Appx15, Appx89, Appx102; Appx390; *See* Cal. Lab. Code. Ann. § 3212 (West, 2022) ("the term 'injury' includes pneumonia and heart trouble that develops or manifests itself during a period while the member is in the service of the office, staff, department, or unit" and "pneumonia so developing or manifesting itself in those cases shall be presumed to arise out of and in the course of the employment.")

Mr. Lobo makes much of the fact that Dr. Hyman reviewed voluminous records, including "9344 pages, 46.5 inches of medical records," and Dr. Hyman physically examined Mr. Lobo, App. Br. at 17, but the records and physical exam did not identify when or how Mr. Lobo was exposed to the pneumonia in order to

support a conclusion that he sustained the injury in the line of duty. Dr. Hyman's reports indicate that Mr. Lobo contracted pneumonia in the course of his correctional work on the basis that Mr. Lobo was "not aware of direct contact with anybody in the home environment who had similar difficulties or illnesses," and he "was working throughout and up until the time of his severe illness ... [ and] had contact with inmates and the inmate population is well known to harbor multiple bacteria." Appx378.

As the BJA Director stated, "[n]otably absent from Dr. Hyman's opinions and the record is any medical evidence that [Mr. Lobo] himself contracted pneumonia in the course of his duties as a Deputy Sheriff." Appx16. There is no evidence in the record that any inmates in the jail where Mr. Lobo worked had pneumonia, and there is no evidence that Mr. Lobo had contact with any infected inmates such that he could have been exposed to pneumonia in the course of his work. *Id.* Dr. Hyman's theory of causation—an assertion of generalized and increased risk of exposure to pneumonia in jails—is merely speculation and not evidence of "injury" for PSOB Act purposes. Appx17-18. Dr. Hyman's causation conclusion relies on medical literature about disease in other correctional settings and "is not grounded in any specific consideration of whether the conditions that contributed to an increased risk of infection such as overcrowding actually existed in the particular jail where [Mr. Lobo] worked." Appx17, Appx623. Mr. Lobo

contends that the preponderance of the evidence demonstrates that the pneumonia was industrially related, App. Br. at 18, but he fails to identify where in the 9,344 pages of medical records or Dr. Hyman's report evidence exists that Mr. Lobo was actually exposed to pneumonia in the line of duty.

Although the agency determination of a PSOB claim must be overturned unless "substantial evidence supports the decision," *see*, *e.g.*, *Moore* v. *Dep't of Justice*, 760 F.3d 1369, 1372 (Fed. Cir. 2014), PSOB claims are to be "determine[d] on the basis of legally-sufficient objective evidence, and after reasonable diligence and inquiry" and "decide[d] based on real, objective, and legally sufficient evidence that objectively meets the standards of proof set forth in the law, rather than speculation, fancied legislative intent, uncorroborated assertions, biased evidence, a slanted record, incomplete information, or sympathy, however understandable or deeply felt." H.R. Rep. No. 112-548 at 7, 8 (internal quotation marks omitted); *see also*, *e.g.*, *Tafoya* v. *United States*, 8 Cl. Ct. 256, 262–263 (1985) ("account of events" offered by PSOB claimant's expert was "based primarily on speculation, which is inadequate evidence of what occurred"); *Brister* v. *United States*, No. 01-180C, slip op. at 5–6 (Fed. Cl., Mar. 27, 2002) (rejecting the use of "speculation" as evidence, and stating that "[F]ederal law requires more than reasonable probability. The standard here is whether [the public safety officer's] death was the direct and proximate result of a traumatic injury,

sustained in the line of duty. This higher standard requires more concrete evidence of specific injury.”).

To the extent that Dr. Hyman’s opinion asserts that Mr. Lobo was generally exposed to pneumonia in the course of his duties, such an assertion is equivalent to asserting that pneumonia is an “occupational disease,” which is expressly excluded from the definition of “injury” (set forth under 28 C.F.R. § 32.3) under the PSOB Act’s implementing regulations. *See* 28 C.F.R. §32.3 (Defining *Occupational disease* as a disease that is commonly regarded as a concomitant of an individual’s occupation and excluding occupational diseases from the definition of an injury). Accordingly, Mr. Lobo fails to demonstrate the Bureau’s decision was arbitrary, capricious, or not substantially justified.

### C. Opinions Provided By Dr. Oetgen And Dr. Diaz Further Demonstrate That The BJA Director’s Decision Was Substantially Justified

Mr. Lobo next contends that Dr. Oetgen’s opinion “should be stricken from the record,” is not substantial evidence, and should not be relied upon. App. Br. at 18-20. First, he asserts that Dr. Oetgen’s opinion is of no value because his opinion was on letterhead with a Virginia address, Dr. Oetgen is not licensed in Virginia, and therefore he is ineligible to render a medical opinion. App. Br. at 19. Mr. Lobo cites no evidence in support of his allegation that Dr. Oetgen, whose résumé demonstrates that he was licensed in at least two jurisdictions (Maryland and the District of Columbia) at the time he provided his medical opinion in this

case, provided an unauthorized medical opinion. Appx149. Notably absent from Mr. Lobo's brief is any attack on Dr. Oetgen's qualification as a physician, likely because his qualifications are well documented in his 21-page résumé. Appx143-162.

Other than the bare assertion that Dr. Oetgen is unqualified to offer a medical opinion, Mr. Lobo cites nothing in the PSOB Act or regulations that requires that a doctor be licensed in a specific jurisdiction when they render advice to the PSOB office. And no such provision exists. In fact, 34 U.S.C. § 10225 expressly provides that "any hearing examiner … employed [by the Bureau] shall have the power to . . . conduct examinations and receive evidence *at any place in the United States the [Bureau] may designate*." (Emphasis added). Section 10251(a)(28) of title 34 U.S. Code, in turn, defines "hearing examiner" to "include[] any medical or claims examiner." The evidence in the record shows that Dr. Oetgen was licensed in multiple jurisdictions at the time he offered his opinion, and he has been advising the PSOB program since 1986.[4] Appx141, Appx149.

[4] Simply because Dr. Oetgen's report was transmitted to the BJA from MedTrans, a limited liability company, that appears to be based in Virginia does not mean that Dr. Oetgen was illegally practicing medicine in Virginia. Mr. Lobo's complaints regarding MedTrans LLC's geographic location is a red herring in any event, given Dr. Oetgen's license in multiple jurisdictions and his uncontroverted qualifications. *See* Appx141.

Mr. Lobo also contends that Dr. Oetgen's opinion is of diminished value because he did not identify the records he reviewed, and he did not physically examine Mr. Lobo. App. Br. at 19-20. The pertinent question is whether it was reasonable for the BJA Director to consider Dr. Oetgen's opinions, given his qualifications, experience, and the scope of his review. Dr. Oetgen has advised the PSOB program for decades and holds numerous qualifications that make his opinions especially worth consideration. *See* Appx143-162. Additionally, a physical exam of Mr. Lobo would affirm his status as totally and permanently disabled (which Dr. Oetgen concluded in his report) but would not answer the relevant question of whether such injuries occurred in the line of duty.[5] Mr. Lobo challenges Dr. Oetgen's opinion that the record is devoid of evidence that the injury was incurred in the line of duty, but Mr. Lobo fails to identify any non-speculative record evidence that would refute Dr. Oetgen's opinion. App. Br. at 19; Appx142.

Mr. Lobo also challenges the opinion of Dr. James Diaz, contending that it is "inconclusive, not substantial evidence, and should not be relied upon." App. Br. at 23. Mr. Lobo misunderstands, or at minimum, obfuscates the opinion of Dr. Diaz. First, similar to his challenge of Dr. Oetgen, Mr. Lobo states that

---

[5] Dr. Hyman even testified that he placed "great weight on the records" because Mr. Lobo was unable to provide "much of a [medical] history during that period of time." Appx112-13.

Dr. Diaz did not conduct a physical exam of Mr. Lobo. App. Br. at 20. As discussed above, such an exam would not elucidate whether Mr. Lobo's injuries were sustained in the line of duty. Mr. Lobo next contends that Dr. Diaz did not review the medical records, but this is factually incorrect. In fact, Dr. Diaz enumerated all of the medical records that he reviewed, *see* Appx620-633, and he was provided with access to all of the medical records that were submitted to the PSOB office. App611-616.

Dr. Diaz's opinion states that Mr. Lobo was "equally at likely risk of acquiring severe *S. pneumoniae* CAP by either aspiration or by inhalation, and his CAP may not have been 100% *industrial related* as asserted by Dr. Hyman." Appx626 (emphasis in original). Dr. Hyman's opinion appears to account only for the potential exposure to *S. pneumoniae* via inhalation, but Dr. Diaz's opinion notes that in about half of all pneumococcal CAP cases, it is due to the aspiration of colonizing bacteria. *Id*. He further notes that Mr. Lobo "may have become colonized with *S. pneumoniae* in his nasopharynx by close contact exposure in the community, by exposure to his own asymptomatic children, or by infected children and adolescents also receiving care at the urgent care center he visited on several occasions." Appx623.

Rather than attempt to show that Dr. Diaz's opinions were unfounded, Mr. Lobo instead continues to focus on articles that discuss the spread of

pneumonia in jails. App. Br. at 22.[6] He states that Dr. Diaz reviewed the various articles that were submitted and that support Dr. Hyman's opinion but faults him for commenting on only one article. App. Br. at 21. He further states that these articles point out problems that existed in the jails where Mr. Lobo worked, but again fails to cite any conditions that specifically applied to Mr. Lobo and the Victor Valley Jail.

Finally, Mr. Lobo argues that Dr. Diaz's report is inconclusive and should not be relied upon because Dr. Diaz could not respond to the question of what caused Mr. Lobo's disabling condition. App. Br. at 22-23. Dr. Diaz was asked to—

> a. "Please identify the external force or factor, e.g., bacteria, shown by the record to have been encountered by Mr. Lobo in the course of his work as a deputy sheriff at the detention center, that, by itself**,** was sufficient to bring about Mr. Lobo's disabling pneumonia and complications.
>
> b. (*Answer only if you could not respond to the previous question*) Please identify the external force or factor shown by the record to have been encountered by Mr. Lobo at the detention center, that contributed to his disabling pneumonia and complications *to a greater degree than* any other external force or factor (or combination of external forces or factors).

[6] In challenging Dr. Diaz's opinion, Mr. Lobo cites to the regulatory definition of occupational disease. App. Br. at 19. It is unclear why Mr. Lobo cited this provision, but as discussed earlier in our brief, "occupational disease" is expressly excluded from the definition of injury. *See* 28 C.F.R. § 32.3.

Appx612.

Dr. Diaz's opinion makes clear that "[e]xposure to *Streptococcus pneumoniae* as the sole causative agent of bacterial CAP contributed to Mr. Lobo's disabling pneumonia and complications *to a greater degree than* any other external force or factor (or combination of external forces or factors)." Appx619-620 (emphasis in original). It is unremarkable that Dr. Diaz could not answer the first question because it is unknown where Mr. Lobo encountered the bacteria, and because, as Dr. Diaz notes in his opinion, diabetes is a further risk factor for contracting severe CAP. *See* Appx623-624. The inconclusive nature of the report from Dr. Diaz regarding the source of the exposure only underscores Dr. Hyman's analysis as a speculative conclusion that is not based on evidence of exposure at Mr. Lobo's workplace.

The PSOB Act's implementing regulations provide that, "[e]xcept as otherwise may be expressly provided in the Act or [the implementing regulations], a claimant has the burden of persuasion as to all material issues of fact, and by the standard of proof of 'more likely than not.'" 28 C.F.R. § 32.5(a). Although we are certainly sympathetic to Mr. Lobo's circumstances, there is simply no *evidence*—there is nothing beyond *speculation*—that Mr. Lobo's exposure to the pneumonia that resulted in his disabled condition occurred in the line of duty. Accordingly, the BJA Director lawfully determined that Mr. Lobo failed to establish eligibility

under the PSOB Act and implementing regulations, and based on the evidence before it, denied the claim. Appx26. Because the Director's determination is consistent with the law, supported by substantial evidence, and not arbitrary or capricious, it should be affirmed.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the decision of the Director.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s Albert S. Iarossi
ALBERT S. IAROSSI
Assistant Director

/s/ Anne M. Delmare
ANNE M. DELMARE
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-0531
E-mail: Anne.M.Delmare@usdoj.gov

June 3, 2024 *Attorneys for the Respondent*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 3rd day of June, 2024, a copy of the foregoing "CORRECTED BRIEF FOR RESPONDENT" was filed electronically.

X This filing was served electronically on all parties by operation of the Court's electronic filing system.

/s/ Anne M. Delmare
ANNE M. DELMARE

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 6888 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/ Anne M. Delmare
ANNE M. DELMARE