# United States Court of Appeals for the Federal Circuit

---

**ALBERT NELSON LOBO,**
*Petitioner*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2024-1198

---

Petition for review of a decision of the Bureau of Justice Assistance in PSOB Claim No. 2015-DIS-039.

---

Decided:  June 9, 2025

---

BRIAN COLLINS, Law Offices of Brian W. Collins, APC, Highland, CA, argued for petitioner.

ANNE DELMARE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by BRIAN M. BOYNTON, ALBERT S. IAROSSI, PATRICIA M. MCCARTHY.

---

Before TARANTO and STOLL, *Circuit Judges*, and SCARSI, *District Judge*.[1]

TARANTO, *Circuit Judge*.

In the winter and early spring of 2010, Albert Lobo was a public safety officer (Deputy Sheriff, with Corporal rank) for San Bernardino County in California and was working at either or both of two county detention facilities (jails). He came down with pneumonia, which, progressing to sepsis, led to multiple amputations that left him permanently and totally disabled. Between 2012 and 2014, he was granted a disability retirement at the county level and workers' compensation benefits at the state level.

Thereafter, in March 2015, Mr. Lobo filed the federal-law claim at issue here—a claim for disability-based benefits under the Public Safety Officers' Benefits Act of 1976 (PSOB Act), 34 U.S.C. § 10281, filed with the Public Safety Officers' Benefits Office (PSOB Office) of the Bureau of Justice Assistance (Bureau) of the U.S. Department of Justice. The PSOB Office (in May 2016), a hearing officer (in October 2017), and the Bureau's Director (in August 2023) found that Mr. Lobo was a public safety officer who was permanently and totally disabled due to the severe complications caused by his pneumonia, but they nonetheless denied the PSOB claim, finding that Mr. Lobo had not proven that he caught the pneumonia in the line of duty, *i.e.*, at the jail(s) where he worked. On Mr. Lobo's appeal, we hold that the Bureau made insufficient efforts to obtain information that, considering the other evidence before the Bureau, could be highly material to a sound adjudication of the decisive locus-of-origin issue. We therefore vacate the Director's decision and remand for further proceedings.

---

[1]     The Honorable Mark C. Scarsi, District Judge, United States District Court for the Central District of California, sitting by designation.

I

A

The Public Safety Officers' Benefits Act of 1976 (PSOB Act), as amended and recodified, states that "a benefit shall be payable to [a] public safety officer" "in any case in which the Bureau determines that [the] public safety officer has become permanently and totally disabled as the direct and proximate result of a personal injury sustained in the line of duty." 34 U.S.C. § 10281(b); *see* Pub. L. No. 101-647, § 1301, 104 Stat. 4834 (Nov. 29, 1990) (authorizing disability benefits). The statute adds: "The Bureau, with all due diligence, shall expeditiously attempt to obtain the information and documentation necessary to adjudicate a benefit claim filed under this subchapter." 34 U.S.C. § 10288(a). Specifically, "[i]f a benefit claim . . . is unable to be adjudicated by the Bureau because of a lack of information or documentation from a third party, such as a public agency, and such information is not readily available to the claimant," the Bureau "may use available investigative tools, including subpoenas" to adjudicate a claim or obtain information necessary to adjudicate the claim "if the Bureau deems such use to be necessary to adjudicate or conducive to expediting the adjudication of" the claim. *Id.* § 10288(b). The provisions of § 10288 became law on June 2, 2017, *see* Public Safety Officers' Benefits Improvement Act of 2017, Pub. L. No. 115-36, § 4, 131 Stat. 849, 852 (June 2, 2017), and applied to any claim, like Mr. Lobo's, that was "pending before the Bureau of Justice Assistance on the date of enactment" (or received on or after that date), *id.* § 6, 131 Stat. at 852–53.

The statute authorizes the Bureau "to establish such rules, regulations, and procedures as may be necessary to carry out the purposes" of the PSOB Act. 34 U.S.C. § 10285(a). An implementing regulation states: "Except as otherwise may be expressly provided . . . , a claimant has the burden of persuasion as to all material issues of fact,

and by the standard of proof of 'more likely than not.'" 28 C.F.R. § 32.5(a).

## B

In 1997, Mr. Lobo began working as a public safety officer at the San Bernardino County Sheriff's Office. J.A. 4, 50. In late 2009, he was assigned to work at the Adelanto Detention Center and, later, to the Victor Valley Jail (collectively, the jails). J.A. 4, 50, 234; Oral Arg. at 0:30–1:00, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=24-1198_05072025.mp3. In January 2010, Mr. Lobo developed "flu-like symptoms, including a cough and runny nose," and in March 2010, he "sought outpatient treatment for an earache and sore throat." J.A. 4; *see* J.A. 372–73, 391–92. On April 24, 2010, Mr. Lobo went to the emergency department at the San Antonio Community Hospital, where he was diagnosed with, among other conditions, community-acquired pneumonia (*i.e.*, "pneumonia acquired outside of the hospital") and sepsis. J.A. 4, 26; *see* J.A. 377. Mr. Lobo's condition worsened, and he "sustained interstitial lung disease, myocardial infarction, and amputations of portions of four limbs due to disseminated intravascular coagulation." J.A. 4; *see* J.A. 118–22, 376–77.

When Mr. Lobo sought workers' compensation from the County, he and the County agreed to have Dr. Mark Hyman review his medical records and perform medical examinations—one on May 2, 2011, and another on November 14, 2012. J.A. 5. After the first examination, Dr. Hyman opined that Mr. Lobo was "100% disabled" and that his severe medical complications and disability were caused by pneumonia. J.A. 377–78; *see* J.A. 5–6. In a July 2011 deposition, Dr. Hyman opined that there was a "far greater" likelihood that Mr. Lobo acquired pneumonia through his work environment, *i.e.*, the jails, than through his visits to urgent-care clinics. J.A. 129; *see also* J.A. 128–31. He noted that California's workers' compensation statute establishes an applicable legal presumption that

"upper respiratory infections and pneumonia in a peace of-
ficer are presumed to be industrially related," J.A. 378; *see*
Cal. Lab. Code § 3212, and explained that, in forming his
opinion, he relied on "medical literature that identifies in-
mate and prison populations as having high degrees of in-
fectious agents" and high rates of transmission, J.A. 130.

On November 28, 2012, an administrative law judge
assigned by the Workers' Compensation Appeals Board of
California awarded Mr. Lobo various workers' compensa-
tion benefits. J.A. 83. On August 1, 2014, the Workers'
Compensation Appeals Board in relevant part affirmed
that decision. J.A. 88–101; *see* J.A. 5. Meanwhile, on April
4, 2013, the San Bernardino County Employees' Retire-
ment Association granted Mr. Lobo a service-connected dis-
ability retirement with accompanying benefits, effective
January 12, 2013. J.A. 567, 570; *see* J.A. 4.

C

On March 9, 2015, Mr. Lobo filed with the PSOB Office
of the Department of Justice's Bureau of Justice Assistance
a claim for disability benefits under 34 U.S.C. § 10281(b).
J.A. 2. In late September 2015, the PSOB Office engaged
Dr. William Oetgen to review Mr. Lobo's medical records
and provide opinions on Mr. Lobo's disability. J.A. 137–40.
Dr. Oetgen responded in mid-October with a "Preliminary
Opinion." J.A. 141–42.

Dr. Oetgen opined that while "[t]here is medical cer-
tainty that Mr. Lobo's pneumonia directly caused his sub-
sequent medical complications and led to his amputations
. . . . [and] that Mr. Lobo is now totally and permanently
disabled," Mr. Lobo's file "is devoid of evidence that [his]
illness was work related or that he contracted pneumonia
from an infected inmate." J.A. 142. He observed that "[i]t
is true that people who live and work in crowded places,
such as . . . prisons, have a higher risk of contracting com-
munity acquired pneumonia." J.A. 142. "However," he
added, "those with diabetes, such as Mr. Lobo, also are

more susceptible to infections such as pneumonia," without saying or explaining how such greater susceptibility bears on the locus-of-origin question. J.A. 142. He concluded that "[t]here is no medical certainty in this case that the performance of the claimant's law enforcement duties was a substantial factor in his development of pneumonia." J.A. 142. The "medical certainty" standard Dr. Oetgen used was defined in the PSOB Office's instruction to be higher than a more-likely-than-not standard: The instruction defined "medical certainty" to require "convincing evidence," with a footnote after that phrase equating it ("[i].e.") to "clear and convincing evidence," defined as "highly probable or reasonably certain," "a greater burden than preponderance of the evidence." J.A. 139 & n.2.

On May 5, 2016, the PSOB Office, relying on Dr. Oetgen's opinion, denied the claim. J.A. 2, 163–66.

Mr. Lobo timely filed a request for a determination by a Hearing Officer under 28 C.F.R. § 32.29. J.A. 577; *see* J.A. 3. Mr. Lobo provided a supplemental report from Dr. Hyman, dated March 28, 2017, in which Dr. Hyman reiterated his opinion that Mr. Lobo's pneumonia was "industrially related," *i.e.*, caused by "his work as a public safety personnel in the jails." J.A. 294–95; *see* J.A. 213. On April 4, 2017, the assigned Hearing Officer held a hearing. J.A. 214–16, 231–34; *see* J.A. 3 n.9. On October 23, 2017, the Hearing Officer ruled that Mr. Lobo "ha[d] not established by a standard of more likely than not that he contracted pneumonia in the line of duty." J.A. 584; *see* J.A. 577–85.

Mr. Lobo then timely filed a request for review by the Bureau Director under 28 C.F.R. §§ 32.46–54. J.A. 597; *see* J.A. 3. The Bureau Director sought out another medical opinion, this time from Dr. James Diaz. J.A. 610, 611–16. Dr. Diaz did not offer an opinion about where the pneumonia was more likely contracted—outside the jails versus in the jails. J.A. 617–34; *see* J.A. 8 & n.51. He did not say that the two possibilities were equally likely. He went no

further than saying that Mr. Lobo "may have" or "could
have" contracted pneumonia outside the jails.  J.A. 623
("Mr. Lobo could have been exposed to [the pathogen] ei-
ther by contact with infected asymptomatic inmates at the
jail facilities or by contact with infected patients, especially
children and adolescents, waiting to be seen at the same
urgent care center he frequented for months . . . ."), 626; *see
also* J.A. 623 (the pneumonia "may not have been 100% *in-
dustrially related* as asserted by Dr. Hyman").  Two specific
portions of Dr. Diaz's report warrant mention.  Dr. Diaz
discussed one study of a pneumonia outbreak in an over-
crowded Texas prison and said that the two jails at issue
here "did not appear to be overcrowded" or comparable to
the Texas prison, J.A. 623, but he did not address whether
even jails like those at issue here are more likely to foster
pneumonia than other potential sources of the disease here
(specifically, urgent-care clinics).  And Dr. Diaz included in
his evidence summary the following language: "I am not
aware of other inmates or staff being diagnosed with pneu-
monia during my assignment at the Victor Valley Jail."
J.A. 624 (citing a passage, not supplied to this court, in the
transcript of the April 4, 2017 hearing before the Hearing
Officer, with no clear attribution of the statement).

On August 21, 2023, the Bureau Director denied Mr.
Lobo's benefits claim.  J.A. 1–17, 25; *see also* J.A. 18–24
(listing of record material).  In the final paragraph, the Di-
rector stated the reason for denial—that the Director was
not persuaded that it was more likely than not that Mr.
Lobo "contracted his disabling pneumonia in the course of
performing line of duty activities"—and highlighted the fol-
lowing bases for that conclusion: "the lack of evidence in
the record as to any pneumonia-infected inmate in the jail
where [Mr. Lobo] worked and any opportunity for trans-
mission of infection to [Mr. Lobo]"; "Dr. Oetgen's statement
that 'the file is devoid of evidence that [Mr. Lobo's] illness
was work related or that he contracted pneumonia from an
infected inmate'"; and "Dr. Diaz's inability to identify a

particular source of [Mr. Lobo]'s pneumonia." J.A. 17 (citations omitted). The Director relied on Dr. Oetgen and Dr. Diaz after having discounted Dr. Hyman's causation opinion for relying on the presumption under California's workers'-compensation law and for relying on correctional-setting medical literature without providing "specific consideration of whether the conditions that contributed to an increased risk of infection" in that literature "actually existed in the particular jail where [Mr. Lobo] worked." J.A. 15–16.

Mr. Lobo timely appealed the Director's determination to us. We have jurisdiction under 34 U.S.C. § 10287.

II

We review the Bureau's application of its own regulations to determine "(1) whether there has been substantial compliance with statutory requirements and provisions of implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the government officials involved; and (3) whether substantial evidence supports the decision denying the claim." *Li v. Department of Justice*, 947 F.3d 804, 807 (Fed. Cir. 2020) (quoting *Amber-Messick v. United States*, 483 F.3d 1316, 1321 (Fed. Cir. 2007)). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

The parties do not dispute that Mr. Lobo was a public safety officer and that his pneumonia caused his permanent and total disability. The only issue in contention is whether Mr. Lobo contracted his pneumonia "in the line of duty," and the question before us is whether the Bureau adjudicated that issue properly. We conclude that there is a deficiency of potentially dispositive significance that warrants a remand.

Mr. Lobo in this court focuses on the assertion that the Director violated statutory provisions that require the Bureau to "give substantial weight to the evidence and all findings of fact" on eligibility issues presented by an "administrative or investigative agency," 34 U.S.C. § 10285(b)(2), and to adopt certain certified facts (from such an agency) regarding eligibility if "supported by substantial evidence," *id.* § 10285(b)(3). Insofar as those provisions concern *findings of fact*, we reject Mr. Lobo's assertion of error by the Director. Legal conclusions are outside the ambit of those provisions. *See Amber-Messick*, 483 F.3d at 1325; *Demutiis v. United States*, 291 F.3d 1373, 1379–80 (Fed. Cir. 2002); *see also Malin v. Department of Justice*, 623 F. App'x 995, 999 (Fed. Cir. 2015). And the only factual issue in dispute in the present matter is whether the pneumonia more likely than not came from the jails, and it suffices here to say that Mr. Lobo has not pointed to any finding on that specific fact in the agency determinations on which he relies. California workers'-compensation law establishes a legal presumption of work connection, and Mr. Lobo has identified no finding of fact on the issue here that is independent of that presumption.

The remaining aspect of the above-cited provisions is the requirement that the Director give "substantial weight" to *evidence* presented by a covered agency. Regarding the issue now in dispute, that requirement extends at most to Dr. Hyman's opinion on the likely origin of Mr. Lobo's pneumonia in the jails. And the Director undoubtedly addressed that opinion in detail, providing reasons to discount the opinion. But determining whether an adjudicator has prejudicially denied "substantial weight" to evidence must involve consideration of the other evidence, much as applying "[t]he substantial evidence standard . . . involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *OSI Pharmaceuticals, LLC v. Apotex Inc.*, 939 F.3d 1375, 1381 (Fed. Cir. 2019)

(internal quotation marks and citation omitted). Here, Mr. Lobo in effect presents "substantial weight" and "substantial evidence" challenges to the Director's decision. Those issues are best considered together. We also conclude that such consideration requires a remand for further efforts at record development and further analysis by the Director (which, of course, could lead to a grant of benefits that moots the challenges now before us).

A remand is warranted based on what the Director emphasized is missing from the record. The Director stressed, in reaching a conclusion, the absence of evidence of whether there was "any pneumonia-infected inmate in the jail[s] where [Mr. Lobo] worked"—or, we add, non-inmate persons present in the jails at the relevant time—along with "any opportunity for transmission of infection to [Mr. Lobo]." J.A. 17. The Director obviously recognized the potential significance of such evidence. And for good reason: The other evidence on the causation issue, particularly the evidence against Mr. Lobo's position, is thin.

As we have recounted above, of the three physicians to address the issue, only Dr. Hyman expressed an opinion on whether the jails or other places were more likely the source of the pneumonia. He opined that the jails were the more likely source. Dr. Oetgen did not express a view on which source was more likely. Dr. Diaz also did not do so. Moreover, neither Dr. Diaz nor Dr. Oetgen even said that the two possibilities were equally likely; the Director said otherwise as to Dr. Diaz, J.A. 3 & n.16 (citing J.A. 623); J.A. 8 & n.51 (same), but neither the cited page nor anything else in Dr. Diaz's report supports that characterization. Further, Dr. Oetgen seems to have used the wrong standard—"medical certainty" understood as a clear-and-convincing-evidence standard, which is more demanding than the preponderance standard of more likely than not. J.A. 139 & n.2, 142. At the same time, the Director found Dr. Hyman's opinion itself to be insufficiently supported "[i]n the absence of evidence that anyone in [Mr. Lobo's]

work setting actually had pneumonia, and that [Mr. Lobo] actually had some contact with infected individuals." J.A. 16.

We agree with the Director's own apparent recognition that this evidence, if available, could be crucial to the adjudication given the sparseness of the other evidence in the record. Whether there were inmates or others in the jails at the relevant time who were documented to have the pneumonia-causing agent—and, if so, whether Mr. Lobo's work assignments created opportunities for encounters with such persons—would clearly be important to answering the question of where he contracted pneumonia. Yet the health information about persons in the jails is not in the record before us, and it appears that neither party sought to obtain it. *See* Oral Arg. at 1:00–4:22; 14:10–19:52. Of course, the information might not exist or be obtainable, but we have no present basis for so concluding.

Even outside the PSOB context, the Supreme Court has recognized that sometimes a reviewing court may "set aside agency action under the Administrative Procedure Act because of failure to adduce empirical data that can readily be obtained." *Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (citing *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 46–56 (1983)). In the PSOB Act specifically, Congress imposed an information-seeking duty on the Bureau, declaring that, "with all due diligence," it "shall expeditiously attempt to obtain the information and documentation necessary to adjudicate a benefit claim." 34 U.S.C. § 10288(a). It added that, if such a benefit claim "is unable to be adjudicated by the Bureau because of a lack of information or documentation from a third party, such as a public agency, and such information is not readily available to the claimant," the Bureau "may use available investigative tools, including subpoenas," to obtain information "from third parties, including public

agencies," if it deems doing so "necessary to adjudicate or conducive to expediting the adjudication of a claim," and the Bureau "may not abandon the benefit claim" unless it has tried using such tools to obtain information deemed necessary. *Id.* § 10288(b).

In the narrow circumstances presented here, we conclude that the Bureau, before ruling on the cause of Mr. Lobo's pneumonia, was required to make reasonable efforts to seek the records at issue from the jails. Mr. Lobo has not made this argument to us, but we will exercise our discretion not to apply the principle of forfeiture here. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

Given the sparseness of evidence on the origin of Mr. Lobo's pneumonia and the Director's acknowledgement of the importance of evidence from a third party to resolve the origin issue, we conclude that an effort to secure records from the jails is "necessary to adjudicate" Mr. Lobo's benefits claim within the meaning of § 10288. That information directly bears on the substantial weight and substantial evidence issues raised, and it could be outcome-determinative. The importance of such information became particularly apparent only after the Director, having solicited yet another medical expert in 2021, received a report that provided only a we-just-don't-know opinion and left the Director, who was faced with the thin record we have discussed, emphasizing that a sound determination of the causation question could not be made in the absence of information about pneumonia in the jails at the relevant time.

In the particular circumstances of this case, the Bureau had a duty to seek this information, but it did not. We vacate the Director's decision and remand the case for the Bureau to make reasonable efforts, consistent with the above-cited authorities, to obtain information about pneumonia in the jails at the relevant time. What efforts suffice can hardly be prescribed in advance. If information is secured, a new decision must account for it, including by

performing any relevant correlation of the information with Mr. Lobo's work assignments. In addition, and in any event, a new decision should newly account for the limits on the current record evidence, *e.g.*, concerning what Dr. Diaz said and the standard Dr. Oetgen seemingly used, that we have identified in this opinion.

### III

For the foregoing reasons, we vacate the Bureau's denial of benefits and remand the case for additional proceedings consistent with this opinion.

The parties shall bear their own costs.

**VACATED AND REMANDED**